# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| KATHLEEN HOWARTH, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BRIAN HOWARTH, AND INDIVIDUALLY<br><br>    Plaintiffs,<br><br>    vs.<br><br>BOUNDARY COUNTY, et al,<br><br>    Defendants. | Case No.: 2:14-cv-00312-REB<br><br>**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court is a Motion for Summary Judgment (Dkt. 29), in which Defendants Boundary County, Boundary County Sheriff's Office, Boundary County Detention Facility, David Colby, Richard Schmitz, Greg Sprungl, Robert Pew, John McClelland, Kathleen Vanmeter, Jeff Hoff, John Doe Elam, and James Ranlett (collectively "the Defendants") ask the Court to dismiss claims filed against them by Plaintiff Kathleen Howarth. The Court heard oral argument on Defendants' Motion for Summary Judgment, and on their related Motion to Strike (Dkt. 44), on April 4, 2016. On May 10, 2016, the Court issued a decision in which it denied the Motion to Strike in part, and gave Defendants an opportunity to obtain their own forensic expert witness to rebut the claims of Plaintiff's late-disclosed expert, Gregg Stutchman. (Dkt. 54). The Court has

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 1**

now reviewed not only the original briefing and submissions of the parties, but also the additional evidence and briefs submitted in accordance with the Court's Order on the Motion to Strike, and now issues the following Order. This Order also addresses the remaining issues in Defendant's Motion to Strike (Dkt. 44), which was partially denied in the previous order of May 10, 2016.

## BACKGROUND

This is a medical care deliberate indifference case arising under the Eighth Amendment to the United States Constitution. The Plaintiff, Kathleen Howarth, seeks damages arising from the death of her husband Brian.  Brian died of acute pneumonia while in the custody of the Boundary County Detention Facility. Though the specific facts related to the deliberate indifference claims against each defendant will be discussed in detail in the analysis section of this opinion, generally and for purposes of background, the events giving rise to this lawsuit are as follows.

The Boundary County Detention Facility is located in Bonners Ferry, Idaho. It is a jail that houses, on average, between twenty and twenty-five inmates per month. (Defendants' Statement of Facts, Dkt. 29-2, p.2). Brian Howarth was taken into custody on January 14, 2014, on charges related to driving while intoxicated. (*Id.*)*.* At the time of his booking Mr. Howarth was in good health.  However, he began to feel ill around January 20, 2014. On that day, he phoned his wife Kathleen and said he had caught a

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 2**

virus that she had been ill with prior to his incarceration. That same day, Mr. Howarth told Sgt. David Colby that he was not feeling well. (*Id.*). Sgt. Colby encouraged Mr. Howarth to fill out a "request for medical Care" form, which led to Mr. Howarth being seen the next day by Dr. Troy Geyman.  (*Id.*, at pp. 3-4.)  Dr. Geyman, who was a contracted medical provider, diagnosed Mr. Howarth with a sinus infection.  He prescribed 800 mg of Ibuprofen to be taken three times a day, as well as Sulfamethoxa/Thrimthopr, an antibiotic. Mr. Howarth began taking these medications as prescribed. Dr. Geyman also instructed the detention deputies to take Mr. Howarth to the emergency room if he did not get better within the next few days. (Id. at p. 4).

Two days later, Mr. Howarth was still sick. During the night shift on January 22, 2014, Deputy Robert Pew noticed that Howarth appeared unwell, that he was coughing, and that his breathing seemed shallow. Deputy Pew was concerned enough about Mr. Howarth's health that he did not put Howarth on "lock down," that night.  That meant Mr. Howarth was free to move about the jail's day room, rather than being locked in his cell. This allowed Deputy Pew to keep a closer eye on Mr. Howarth.  (*Id.* p. 5). The following morning, Deputy Pew told Mr. Howarth that he needed to go to the hospital, and Mr. Howarth agreed to go. (*Id.* p. 6).

Deputy Robert Elam transported Mr. Howarth to the Boundary Community Hospital on the morning of  January 23, 2014, and helped him check into the Emergency

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 3**

Room. (Id. p. 6-7). Dr. Gordon Luther, who treated Mr. Howarth during this outpatient ER visit, suspected pneumonia. However, Dr. Luther did not order a chest x-ray to confirm this diagnosis, and provided discharge instructions for bronchitis instead of pneumonia.  Dr. Luther did this, he explained, because the treatment for both bronchitis and pneumonia was essentially the same. (Plaintiff's Statement of Facts, Dkt. 31, ¶ 13). Mr. Howarth was prescribed a second antibiotic, Zithromax, and given a nebulizer inhaler. The remainder of the one-page discharge instruction sheet advised rest, fluids, using the inhaler as needed, and called for the patient to return to the emergency room if the symptoms worsened. (Defendants' Statement of Facts, p. 7-8).

Up until this point in time, the parties agree upon nearly all of the facts. After Mr. Howarth returned from the hospital to the jail, however, their accounts begin to diverge. The Defendants contend that, even though Mr. Howarth continued to cough and exhibit shortness of breath after he returned from the hospital, his symptoms were not different from, or worse than, those that the detention facility deputies observed  prior to the emergency room visit. (Defense Brief, Dkt. 29-1, p. 10). In contrast, Mr. Howarth's wife Kathleen testified that Mr. Howarth's appearance and manner on the afternoon of January 23, 2014 caused her great concern.  Howarth's cell mate, Gerald Clark, testified that Mr. Howarth's condition during the evening hours of January 23 and the early morning hours of January 24 was noticeably worse than it had been before.

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 4**

Both Mr. Clark and Ms. Howarth were concerned enough that they each separately suggested to various jail deputies that Mr. Howarth should be taken back to the hospital. (Plaintiff's Statement of Facts, Dkt. 31, ¶ 19-25). Several contacts were made by jail deputies with Mr. Howarth during the night, which will be discussed in more detail below.  On the morning of January 24, 2014, at about 6:30 a.m., jail staff found Mr. Howarth unresponsive in his cell.  An ambulance was called, but Howarth was dead upon his arrival at the Boundary Community Hospital around 7:30 a.m., due to a bilateral pneumonia from an infection of methicillin resistant staphlycoccus areus (MRSA).

## LEGAL STANDARDS

### A.      Summary Judgment Standards

Summary judgment is appropriate where a party can show that, as to a particular claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id. at 327*. "[T]he mere existence of some alleged factual dispute between the parties will not defeat

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 5**

an otherwise properly supported motion for summary judgment ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Rather, there must be no genuine dispute as to any material fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id*. at 248. Disputes over facts that are not material to the resolution of the motion will not preclude summary judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252.

**ANALYSIS**

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 6**

**A.      Motion to Strike (Dkt. 44)**

The Court previously denied Defendants' Motion to Strike to the extent that it

sought to prevent the Plaintiff from using the opinions of Gary Stutchman, a forensic

expert who enhanced the audio portions of the recordings made by the surveillance

cameras in the Boundary County Jail.  However, the Court permitted Defendants to

obtain their own expert testimony about such matters, and the opinions of that expert are

now in the record. The only remaining issue raised by the Motion to Strike concerns the

declaration of Plaintiff's other expert, Roy T. Gravette, a former corrections officer who

expresses extensive criticisms of the conduct of correctional officers and of the jail

policies and procedures. Specifically, Defendants argue that the Gravette Declaration

(Dkt. 34) should be stricken because it includes legal conclusions about an ultimate issue

of law.

Because the ultimate question of deliberate indifference is for the jury to decide,

Defendants contend that an expert should not be allowed to testify that individual

correctional officers acted with deliberate indifference.  This argument is often well-

made, as a general matter.  *Stakey v. Stander,* 2011 WL 887563 (D. Idaho 2011).

However, questions of the exact boundaries of expert testimony are best decided in the

context of motions in limine submitted before trial, and even if opinions focusing upon

the ultimate issue of deliberate indifference were stricken, such a ruling would not justify

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY
JUDGMENT - 7**

striking the *entire* Gravette declaration. The declaration discusses many facets of the events leading up to Mr. Howarth's death, with various criticisms of the conduct of correctional officers, and Mr. Gravette only occasionally invokes terms such as "deliberate indifference." Because Defendants do not sort out the arguably objectionable testimony from unobjectionable testimony, and instead request that the entire Gravette declaration be stricken, the motion to strike will be denied. (Defendants' Brief, Dkt. 44, p. 10-11).  In any event, as the following discussion shows, there is ample evidence in the record from which a reasonable trier of fact could infer that several of the Defendants acted with the state of mind necessary to prove deliberate indifference, even without relying on opinions of Mr. Gravette that may or may not touch on ultimate conclusions.

**B.    Issues of Fact Preclude Summary Judgment on the Eighth Amendment Claims**

The Eighth Amendment claims and the various defendants in this case can be placed into two distinct groups, each of which requires a somewhat different analysis. The first group consists of Officers David Colby, Richard Schmitz, Robert Pew, John McClelland, Kathleen Vanmeter, Jeff Hoff, and James Rantlett, as well as the Defendant designated as "John Doe Elam" who is identified throughout the record as Sergeant Robert Elam. The second group of Defendants consists of Boundary County itself, the Boundary County Sheriff's Office, the Boundary County Detention facility, as well as Greg Sprungl, who is the Boundary County Sheriff. The Court addresses the claims

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 8**

against the individual detention deputies first, followed by the claims against the

Institutional Defendants.

     **1.**    **Eighth Amendment Deliberate Indifference Standards.**

The Eighth Amendment includes the right to adequate medical care in prison, and

prison officials or prison medical providers can be held liable for Eighth Amendment

violations if their "acts or omissions [were] sufficiently harmful to evidence deliberate

indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A

prison official or prison medical provider acts with "deliberate indifference . . . only if the

[prison official] knows of and disregards an excessive risk to inmate health and safety."

*Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal

quotation marks omitted), (overruled on other grounds, *Castro v. County of Los Angeles*,

__ F.3d __, 2016 WL 4268955 (9th Cir. 2016). In the medical context, to prove that a

defendant acted with deliberate indifference the plaintiff must show both "a purposeful

act or failure to respond to a prisoner's pain or possible medical need and . . . harm

caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

Deliberate indifference can be "manifested by prison doctors in their response to the

prisoner's needs or by prison guards in intentionally denying or delaying access to

medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429

U.S. at 104-05 (footnotes omitted).Critical to the inquiry in this case, an Eighth

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY
JUDGMENT - 9**

Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc). The subjective prong of the deliberate indifference standard "entails something more than mere negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson* 290 F.3d at 1188. However, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) ("[D]eliberate indifference to medical needs may be shown by circumstantial evidence

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 10**

when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm.").

Significantly, however, mere indifference, medical malpractice, or negligence will not support a claim under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). If medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi*, 391 F.3d at 1061. Further, non-medical personnel generally are entitled to rely on the opinions of medical professionals with respect to the medical treatment of an inmate. Even so, if "a reasonable person would likely determine [the medical treatment] to be inferior," the fact that an official is not medically trained will not shield that official from liability for deliberate indifference. *Snow*, 681 F.3d at 986 (internal quotation marks omitted).

## 2.    Issues of Fact Exist With Respect to Officers McClelland, Pew, Colby and Elam.

There is no question that Mr. Howarth suffered from a serious medical condition. Therefore, the inquiry here focuses on the state of mind of the jail deputies and whether a reasonable trier of fact could conclude that any one or more of the individual deputies had subjective knowledge of the risk to Mr. Howarth from delaying medical attention during the evening of January 23 and the morning hours of January 24, 2014.

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 11**

These Defendants argue that, far from ignoring Mr. Howarth's serious medical needs, they were actually well aware that he was sick, they were appropriately concerned for his comfort and welfare, and that in several instances during the days preceding Mr. Howarth's death, they took steps to make sure he received appropriate medical attention. They further contend that no deputy knew that Howarth had pneumonia because the discharge instructions that Mr. Howarth was given after the emergency room visit on January 23, 2014 identified his illness as bronchitis. The deputies further argue that, as lay-persons with no specialized medical knowledge, they had no reason to know how seriously ill Mr. Howarth was in the morning hours of January 24, 2014. The detention deputy Defendants also say that Mr. Howarth appeared to improve somewhat after returning from the emergency room, and he never asked to be taken back to the hospital. (Defense Brief, Dkt. 29-1 at p. 9-11). Finally, they also point out that one of Plaintiff's own experts acknowledged that the deputies likely failed to appreciate the seriousness of Mr. Howarth's condition in part because it had been described to them as if it were bronchitis rather than pneumonia. (*Id.,* p. 16).

For these reasons, the detention deputies argue that each of them lacked subjective awareness of the seriousness of Mr. Howarth's condition, or of how quickly it could deteriorate, which would be an essential component of a deliberate indifference claim under *Farmer v. Brennan* and its progeny.

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 12**

### a.      Summary of Relevant Evidence

The Court agrees that this characterization represents one plausible inferential view of the evidence. However, it also minimizes or fails to speak at all to other evidence relating to Mr. Howarth's emergency room visit on January 23, 2014, and with respect to the critical time frame beginning after he returned to the jail until his death early in the morning on January 24, 2014. In arguing that the detention deputies are *not* entitled to summary judgment, Plaintiff emphasizes the following facts:

•      When he saw Mr. Howarth in the emergency room, Dr. Luther actually concluded that Howarth had pneumonia, and not just bronchitis. However, because he had not used a chest x-ray to identify the pneumonia, Dr. Luther gave Mr. Howarth the technical diagnosis of "bronchitis, rule out pneumonia." At his deposition, Dr. Luther testified that the reason he did not do a chest X-ray was because the antibiotics he intended to prescribe, and that he did prescribe, covered pneumonia in addition to bronchitis. Further, the patient discharge instructions were identical for bronchitis and pneumonia, as was the advisory warning to the patient regarding what symptoms would call for a return to the hospital.

•       Deputy Elam was present in the room when Dr. Luther examined and treated Mr. Howarth, and thus presumably heard everything that was said. (Plaintiff's Statement of Facts, Dkt. 31, ¶ 13). Further, the discharge instructions given to Mr.

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 13**

Howarth, which Deputies Pew, Colby, Vanmeter and McClelland testified they saw,

instruct that "if you develop a fever, increased wheezing, chest pain, or severe shortness

of breath, you should contact the doctor immediately." (Statement of Facts ¶ 15 & Elam

Aff., Dkt. 29-10, p. 2. These instructions also instruct the patient, "RETURN HERE IF

WORSENING." (*Id.*)

• Some time after Mr. Howarth's return to the jail on January 23, 2014, his

wife Kathleen visited him. Her testimony of what occurred during this visit is very

different from the Defendants' characterization of the events of that day. Specifically, Ms.

Howarth said her husband looked "terrible," and that she could immediately tell

something was wrong. She said Brian told her, "I can't breathe. I feel terrible. I

really–this is the worst I've ever felt in my life. And I'm getting worse," and also that "I

feel like I'm going to die." She said he was "lean[ing] over just trying to breathe" in

between trying to talk to me," and that when she told him to ask if he could go back to the

hospital, he said that he did want to return. (Plaintiff's Statement of Facts, ¶ 17). Ms.

Howarth also testified that her husband was almost incoherent, and that it was like

"pulling teeth" to get him to answer in between the breathing difficulties. (*Id.*)

• Ms. Howarth testified that she was brushed aside when she attempted to

bring Mr. Howarth's condition to the attention of Deputy McClelland. She told Deputy

McClelland, "He's sick. He can't breathe. Take him back or . . ." (Id.). According to Ms.

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 14**

Howarth, Deputy McClelland said that he knew her husband was sick and that he was getting the medicine from the doctor and that they [i.e. the prison employees] were doing what the doctor instructed. At that point, Ms. Howarth repeated her concern that her husband could not breathe and told Officer McClelland, "Don't' let him die." (Id.). Ms. Howarth said that in reply, Officer McClelland simply said, "Okay, Time to go," and that his manner to her was "intimidating." (Id.).

- Mr. Howarth's cell-mate, Gerald Clark, was also deposed about Mr. Howarth's condition on January 23, 2014 and during the early morning hours of the following day. Mr. Clark testified that Mr. Howarth's condition had worsened, that he was not eating, did not want to get up or do anything, and he was "coughing up blood." (Plaintiff's Statement of Facts, ¶ 21). Mr. Clark said that Mr. Howarth "had blood on his clothes, he had a shampoo bottle that he was spitting in, there was blood on the floor right by his bed" where he had been coughing." (Id. ¶ 21-22). Mr. Clark testified that although he had no medical training, he could tell that Mr. Howarth was getting worse.  (Id. ¶ 23-24).

- That night, Mr. Clark told several of the detention deputies that Mr. Howarth needed to get back to the hospital. Specifically, Clark testified that he raised this subject with Sgt. Elam around dinnertime on January 23, 2014, and that Sgt. Elam simply responded that "there was nothing wrong with Brian other than he needed to quit

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 15**

smoking." (Id. ¶ 23-24).

• Later that evening, Mr. Clark told another deputy that Brian needed to return to the hospital. Mr. Clark recalled that this deputy's name was "Jeff," but staffing records from that evening show that the night shift deputy at that time was Robert Pew. Deputy Pew also submitted an affidavit indicating that he was on duty during the night shift from January 23 until early in the morning of January 24th. (Pew Affidavit Dkt. 29-11, ¶¶ 14-22). Mr. Clark also recalls Mr. Howarth asking to go to the hospital around 4:30 a.m on the morning of January 24th, around the time when the breakfast trays were brought in. (Plaintiff's Statement of Facts, ¶ 25).

• Plaintiffs also submitted evidence that detention staff only rounded on Mr. Howarth's cell five times between midnight on January 23rd and 4:37 a.m. on the 24th, despite jail operation protocol that required inmates to be checked at least every thirty minutes. (Statement of Facts, ¶ 26 & 39). Further, Plaintiffs contend that the spacing of these checks twice left a gap of two hours during which Mr. Howarth was not observed by any detention deputy. These gaps occurred between 12:21 a.m. and 2:30 a.m., and then again beteen 2:30 a.m. and 4:37 a.m. (Statement of Facts at ¶¶ 26-29).

• A few minutes after checking on him at 4:37 a.m., Deputy Pew gave Mr. Howarth his prescribed medications at approximately 4:45 a.m. (Pew Affidavit, ¶ 19).

At this point, the parties' accounts of events begin to diverge even further. Though

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 16**

Defendants maintain that Mr. Howarth did not ask to be taken to the hospital during the early morning hours of January 24, 2014, and did not otherwise ask for assistance, the Plaintiff's forensic enhancement of the audio portions of the recordings made by jail surveillance cameras contradict this narrative.

•    According to the report of Plaintiff's forensic expert, Gregg Stutchman, Mr. Howarth can be heard on the enhanced version of the tapes saying "help me, help me," about two minutes after the 4:37 a.m. encounter with Deputy Pew begins. (Statement of Facts, ¶ 30. See also, Stutchman Affidavit, Exhibit 6, Dkt. 33 at p. 26). Defendants' own forensic expert contested this conclusion, and asserted that there were no recognizable speech patterns consistent with human speech at the time Mr. Stutchman claimed to have identified Mr. Howarth's request for help. (Defendant's Supplemental Brief, Dkt. 56, p. 4). Defendants also appear to assert that Mr. Howarth was alone in his cell at the time that he allegedly asked for help, but this assertion is contradicted by Mr. Stutchman's analysis, which identifies a detention deputy's voice responding within seconds after Mr. Howarth says "help me, help me."

•    Mr. Stutchman's transcript of the enhanced recordings also contains numerous references to "heavy breathing," and "rattling lungs," including one encounter in which the detention deputy observes, "breathing hard, dude," a comment to which Mr. Howarth responds "terrible." (Dkt. 33 p. 32). A couple of minutes after this exchange the

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 17**

deputy on duty (presumably Deputy Pew) tries to assist Mr. Howarth in propping up his mattress so that he can sleep better. At this point Deputy Pew also says, " . . . Sarg gets here, I want to, we will both come and see and talk to you and talk to you alright?" (Stutchman Aff., Exhibt 7, Dkt. 33 at p. 33). This exchange occurs around 4:48 a.m. The comments after this point are ambiguous, but Deputy Pew appears to refer to his intention to take some kind of action when the sergeant arrives. Specifically, the transcript identifies the deputy as saying "When Sarg gets here, I'll have him come see you about getting . . ." Then, after a skip, the deputy adds, "Maybe there's a home deal with that." (*Id.*)

• Sergeant Colby came on duty at 5:20 that morning. (Colby Aff., Dkt. 29-5 at ¶ 9). However, according to Gerald Clark (Howarth's roommate), Sergeant Colby relieved Deputy Pew at that point and so Colby was the only officer on duty at that time from that point until the time Mr. Howarth died. (Clark Depo., Exh. 8 to McRea Aff., Dkt. 32 at p. 51). Sergeant Colby testified that he checked on Howarth at 5:30 a.m. and informed him that he would be taken back to the hospital around 8:00 a.m., as soon as another deputy came on duty. (Colby Depo. Dkt 32 at p. 38 & Colby Affidavit. Dkt. 29-5 at ¶ 9-12). Sergeant Colby's affidavit indicates that Howarth seemed coherent, was not in distress, and seemed "surprised" when he was informed that he'd be going back to the hospital. (*Id.* ¶¶ 9-14). However, the transcript of the enhanced recordings of the

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 18**

encounters between Colby and Mr. Howarth, indicates that the sound of heavy breathing, coughing, and rattling lungs can be heard. (Stutchman Aff., Exhibit 8, Dkt. 33 at p. 38). At one point, Sergeant Colby also recognizes the sound that Mr. Howarth's lungs were making as "rattling," and remarks "I'll keep checking on you, see what the hell we can do. That don't, that rattling don't sound okay." (Dkt. 33 p. 39).

• At one point during this same encounter, Mr. Howarth makes a partly audible remark about blood coming up. Specifically, the transcript reads, "and the, uh, all that blood I got, comes up in my . . . " (*Id.*). The enhanced version of a different camera's recording of this same encounter reveals that Mr. Howarth was asking for help at more than one point, during the same time that another male voice (presumably that of another inmate) was suggesting that he be taken back to the hospital. (Dkt. 33 p. 43-44). Though the transcript, even with the enhancements, is difficult to follow and full of skips, it appears that in response to this exchange the sergeant says "Yeah, you can ride it out, man." (*Id.*). This encounter began around 5:29 a.m. and ended about two-and-a-half minutes later.

• A detention deputy entered Mr. Howarth's cell around 6:04 a.m. to check on him and to make sure he was keeping fluids down. Mr. Howarth said he was in "bad shape," an assessment to which the detention deputy agreed. (Dkt. 57-3 at p. 2). The detention deputy (presumably Sergeant Colby) makes a reference to taking Mr. Howarth

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 19**

back to the hospital, saying,"I may have you taken back up there here in a few hours. If I got somebody coming back, I'll have you checked out again." (Dkt. 57-5 at p. 2-3). However, when Sergeant Colby next entered Mr. Howarth's cell around 6:23 a.m, Mr. Howarth was unresponsive. Howarth was transported to the emergency room. Efforts to revive him were unsuccessful and he was pronounced dead shortly after his arrival.

### b.    Issues of Fact as to Officers Pew, Colby, and Elam Preclude Summary Judgment

The details described above, along with reasonable inferences that must be drawn in favor of the Plaintiffs as the non-movants, are sufficient to create issues of fact on the elements of a deliberate indifference claim against Deputy Pew, and also as to Sergeant Colby and Sergeant Elam. Each officer reviewed the discharge instructions provided by Dr. Luther, and therefore, it can be inferred that they were aware of the need for immediate follow-up contact with the physician or a return to the hospital if certain symptoms appeared or if Howarth's condition worsened. And, although the detention deputies testified generally that Mr. Howarth's health after he returned from the emergency room appeared to be about the same as it had been the previous day, this characterization of events is directly at odds with the testimony of Kathleen Howarth and Gerald Clark, who both testified that Mr. Howarth's condition during the afternoon and evening hours of January 23 was significantly worse than it had been. Each testified that Mr. Howarth was having significant difficulty breathing. Ms. Howarth said her husband

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 20**

was incoherent; Mr. Clark testified that he was coughing up blood. Further, Mr. Clark said he told Deputy Pew and Sgt. Elam that Brian should be taken back to the hospital. Finally, the Stutchman forensic analysis of the audio tapes contradicts the Defendants' version of events, in that the enhanced recordings evidence that Mr. Howarth was asking for help, that he was gasping for breath and coughing and that his lungs were rattling.

From these facts, a reasonable jury could infer that Officers Colby and Pew had subjective knowledge of Mr. Howarth's serious medical condition on the 23rd and 24th of January and nonetheless failed to take steps to obtain adequate medical care for him. Finally, the very fact that significant discrepancies exist between the detention deputies' version of events and the events depicted on the enhanced recordings of the surveillance cameras is one more factor from which a reasonable jury could infer that Deputy Pew and Sergeant Colby had subjective knowledge of the serious nature of Mr. Howarth's condition on the morning he died.

As to Sgt. Elam, the record does not indicate that he was at the jail during the hours just prior to Brian Howarth's death. Nevertheless, there is sufficient evidence in the record to create issues of fact on deliberate indifference with respect to Sergeant Elam as well. As with Deputy Pew and Sgt. Colby, Sgt. Elam also saw the discharge instructions, and he was present during the first hospital visit and, it can reasonably be inferred, was present when Mr. Howarth was told he probably had pneumonia. Sergeant Elam also

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 21**

observed Mr. Howarth throughout the day on January 23, 2014, (Elam Aff., Dkt. 29-9

¶ 16) from which it can reasonably be inferred that he had an opportunity to observe the

same symptoms that so concerned Mr. Howarth's wife and Mr. Clark, the cell-mate. Mr.

Clark testified that after he told Sgt. Elam that Mr. Howarth needed to go to the hospital,

Elam said that Mr. Howarth only needed to quit smoking. From these facts and the

reasonable inferences that can be drawn from them in favor of the non-movants, there is a

genuine issue of material fact as to whether Sgt. Elam had subjective knowledge of Mr.

Howarth's serious medical condition, and disregarded the need for additional medical

attention.

### c.    Deputy McClelland

The facts that might support a claim against Deputy McClelland are less

compelling on this record, but are nevertheless sufficient to preclude summary judgment.

Deputy McClelland was aware of the discharge instructions, and a reasonable inference

can be made that he saw the same things Kathleen Howarth saw in terms of Mr.

Howarth's appearance during visiting hours on January 23, 2014. Deputy McClelland's

interaction with  Mr. Howarth and Kathleen Howarth on that day appears to have ended

by some time in the afternoon, and he also testified that he had no recollection of Mr.

Howarth coughing or having breathing difficulties. (McClelland Depo., Dkt. 32 at ECF p.

45). Yet, Ms. Howarth testified in her deposition that she was concerned enough about

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY
JUDGMENT - 22**

her husband's condition to bring it to Deputy McClelland's attention, that she pleaded

with him not to let her husband die, and that she also said, "take him back," which can be

inferred to mean that she requested that Mr. Howarth be returned to the hospital. Hence,

again based upon reasonable inferences drawn in favor of the Plaintiffs, there is a genuine

issue of material fact as to whether Deputy McClelland was aware of the serious nature of

Mr. Howarth's condition, and yet took no action to contact his physician and did not

otherwise act on Kathleen Howarth's request that he be taken back to the hospital.

The Court is mindful that there are other facts that would militate against a finding

that any of the individual officers acted with deliberate indifference if this case goes to

trial. Virtually all of the detention deputies who had significant interactions with Mr.

Howarth described him as a pleasant and cooperative person whose death shocked and

saddened everyone at the jail. The Court also notes that it was Deputy Pew who first

insisted that Mr. Howarth be taken to the hospital on January 23, 2014. (Pew Affidavit at

¶ 4). Likewise, the fact that the discharge instructions mentioned only bronchitis as

opposed to pneumonia might have tended to minimize the seriousness of Mr. Howarth's

condition in the minds of the detention deputies. And, when viewed in the light most

favorable to the *Defendants,* the enhanced transcripts surveillance tapes suggest that

Sergeant Elam, Sergeant Colby, and Deputy Pew were respectful and caring in their

interactions with Mr. Howarth in the hours before he died. On summary judgment,

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 23**

however, the Court's task is to assess the evidence in the light most favorable to the
Plaintiff, as the non-moving party. And against the above-described evidence that is
favorable to the Defendants, the Court must weigh other evidence emphasized by
Plaintiff, including the enhanced transcripts suggesting that Mr. Howarth did indeed ask
for help on the night he died, and the testimony of Mr. Clark and Ms. Howarth suggesting
that his condition had worsened significantly.

Finally, the Court must also take into consideration the crucial fact that only one
detention deputy was on duty during the hours just before Mr. Howarth died, a staffing
level which allegedly falls short of minimum standards for Idaho jail facilities. (Gravette
Declaration, Dkt. 34, p. 11). The fact that the jail had only one deputy on site for portions
of the morning that Mr. Howarth died is an issue that can be argued to support Plaintiffs'
claims, and further create genuine issues of material fact.  Such a circumstance can
support an inference, when considered in the light most favorable to the Plaintiffs, that
Deputy Pew and Sergeant Colby were well aware that Mr. Howarth's condition presented
an emergency, but that because getting emergency care for Mr. Howarth would have
meant leaving the jail unattended or would have presented significant logistical problems
in obtaining assistance from other sources, the pressing need to get Howarth to the
hospital was delayed until later in the morning.

For all the foregoing reasons, summary judgment is denied as to Officers

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY
JUDGMENT - 24**

McClelland, Pew, Elam and Colby.  However, Plaintiffs have put forward no evidence or argument whatsoever explaining how Officers Schmitz, VanMeter, Hoff, or Rantlett were involved in the events leading to Mr. Howarth's death. Accordingly, the summary judgment motion as to these individual defendants is granted and the claims against these individuals are dismissed.

> ## 2.      Institutional Defendants.

Next, the Court considers the claims against the "Institutional Defendants"–Boundary County, the Boundary County Sheriff's Office, the Boundary County Detention Facility, as well as Sheriff Sprungl.  These are analyzed as claims for institutional liability under *Monell v. Department of Social Services,* 436 U.S. 658 (1978) and as to Sheriff  Sprungl, claims for supervisory liability arising under *Starr v. Baca,* 652 F.3d 1202 (9th Cir. 2011).

As a general rule, local governmental entities are not liable for civil rights violations simply because they employ someone alleged to have committed a violation of another person's constitutional rights. To state a cognizable constitutional claim against a local governmental entity, there must be evidence that the use of an official policy or unofficial custom inflicted the injury complained of by the plaintiff.  *Monell,* 436 U.S. at 694. Under *Monell*, there must be proof that: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 25**

policy or custom was the moving force behind the constitutional violation. *See, e.g., Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). If the purported policy or custom is unwritten, then the Plaintiff must also show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691. Further, liability premised upon any such allegedly improper policy or custom cannot be predicated on isolated or sporadic incidents, but instead, must be founded upon "practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Here, the Plaintiff's evidence makes out a prima facie case of such elements. The record, and in particular, the declaration of Roy Gravette, contains evidence of the kind of informal policy encompassed by the holding in *Monell* which sets forth the standards for municipal or institutional liability in deliberate indifference cases. Gravette opines that the Boundary County Detention Facility regularly had only one deputy on shift, for periods of up to four hours at a time. (Gravette Decl. Dkt. 34, ¶ 11). According to Mr. Gravette, this policy contravened not only industry-wide standards regarding the adequate staffing of correctional facilities, but also contravened the purported Minimum Standards for Idaho Jails, which provided:

> Facilities shall be staffed with a minimum of two detention deputies at all times who have either been certified by POST or will be certified within

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 26**

one year of employment as a detention officer. Certified reserve deputies or similarly certified deputies such as patrol deputies may be used as the second deputy on a fill-in basis. Both deputies shall be physically capapble of immediately responding to jail emergencies at all times.

(Gravette Decl. ¶ 11).

Gravette further states in his Declaration that the Boundary County Detention Facility had failed annual inspections since at least 2011 in part because it was routinely out of compliance with the standards requiring two deputies at all times. (*Id.*). Gravette also states that Sheriff Sprungl had knowledge of such staffing level standards, but did not agree with them and therefore refused to comply with them. *(Id.).*

From such evidence, a reasonable jury could infer the practice of operating the jail with only one deputy was sufficiently widespread and persistent to create liability for the institutional defendants under *Monell,* and against Sheriff Sprungl under theories of supervisory liability. Under the holding in *Starr v. Baca,* a supervisory defendant may be liable for § 1983 violations if he or she was (1) personally involved in the constitutional deprivation; or if there exists (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  652 F.3d at 1207.  Under this framework, Sheriff Sprungl's knowledge of and–at a minimum–his apparent acquiescence in and responsibility for the routine single officer staffing of the Boundary County Detention Center is a sufficient basis to deny summary judgment on the claim for supervisory liability under § 1983.

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 27**

The Court has carefully considered the Defendants' contention that there is no proof that the jail's staffing policies were the "moving force" behind any alleged constitutional violation. But there is such evidence, if not directly found in the testimony and documents, then certainly found in reasonable inferences that can be drawn in favor of the plaintiffs upon such evidence, that the detention deputies on duty the night that Mr. Howarth died might have acted very differently had there been two officers on duty that night instead of one. As Mr. Gravette explained, had there been an additional officer on duty that night, that additional officer could have accompanied Mr. Howarth to the hospital (as would have been required by jail policy, since inmates could not leave the jail unattended), while the other remained behind to keep the jail secure. (Gravette Decl. ¶ 11).

The fact that Sergeant Colby had planned to take Mr. Howarth to the hospital around 8 a.m. also supports the inference that arrangements for Mr. Howarth to return to the hospital would have occurred sooner that night, but for the practical problems in doing so presented by the limited staffing at the jail during those periods. In short, although there are a number of different lenses through which a reasonable jury might choose to view the evidence in this case, one reasonable inference is that the individual detention officers on duty during the morning hours of January 24, 2014 were genuinely concerned for Mr. Howarth's welfare and aware that his condition had become very

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 28**

serious, but were faced with a Hobson's choice of either abandoning their post or waiting until backup arrived, while hoping that Mr. Howarth could simply "ride his illness out."

For these reasons, the motion for summary judgment on the *Monell* claims against the institutional defendants, including Sheriff Sprungl, is denied.

### 3.    Supervisory Liability

Plaintiffs also raise a claim that Mr. Howarth's death resulted from constitutionally inadequate training and supervision of the detention deputies, particularly with respect to the need to conduct checks on all inmates at regular thirty-minute intervals. With respect to this discrete issue, the Court concludes that summary judgment is warranted, a result that is dictated by the holding in *Connick v. Thompson,* 563 U.S. 51 (2011).

*Connick* involved a situation in which a man wrongfully convicted of murder sued a county district attorney for supervisory liability under section 1983. His theory was that the district attorney had not properly trained the deputy prosecutor who had committed a flagrant *Brady* violation, which was inescapably tied to the murder conviction. In holding that the county district attorney could *not* be held liable, the *Connick* court ruled that "a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference." *Id.* at 1366.

The record here contains no such pattern of conduct to suggest that detention deputies *routinely* failed to check on inmates at the proper intervals. Nor does it come

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 29**

close to establishing that Sheriff Sprungl (or any other supervisor, for that matter) was aware of or somehow responsible for any such failure generally, or in particular as to this case. Accordingly, the other supervisory liability claims against Sheriff Sprungl and the other institutional defendant (other than those that relate specifically to the policy of staffing the jail with only one deputy at a time) will be dismissed.

## C.   Defendants Are Not Entitled to Qualified Immunity

Defendants contend, in the alternative, that even if any claims for deliberate indifference withstand summary judgment, each of Plaintiff's claims are nonetheless barred by the doctrine of qualified immunity.

The doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate an inmate's clearly-established federal rights. *See, e.g., Saucier v. Katz,* 533 U.S. 194 (2001); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quotation omitted). "The purpose of qualified immunity is to strike a balance between the competing need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Frary v. County of Marin,* 81

F.Sup.3d 811, 824 (N.D. Cal. 2015) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231

(2009)). A qualified immunity analysis consists of two prongs: (1) whether, [t]aken in the

light most favorable to the party asserting the injury, . . . the facts alleged show the

[defendant's] conduct violated a constitutional right; and (2) whether that right was clearly

established. *Saucier* 533 U.S. 201 (2001). After the Supreme Court's decision in *Pearson*

*v. Callahan,* courts may "exercise their sound discretion in deciding which of the two

prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand." *Pearson,* 129 S. Ct. at 818. Since Plaintiff

has made out a case for deliberate indifference in violation of the Eighth Amendment

against various defendants, as set forth above, the question that remains to be decided is

whether the rights in question were sufficiently established at the time of the events

giving rise to the lawsuit, such that each of the detention deputies would have been aware

that their conduct violated the law. *Frary,* 81 F.Supp.3d at 825.

　　The overall right to medical care in the prison setting has been clear since the

Supreme Court decided *Estelle v. Gamble* in 1976; nonetheless, the qualified immunity

inquiry requires a more context-specific analysis, and cannot be taken in light of only

broad general propositions. *Saucier,* 533 U.S. at 835, 838; *See also, Estate of Ford v.*

*Ramirez Palmer,* 301 F.3d 1043, 1050 (9th Cir. 2002). Even so, in this case the

constitutional rights drawn upon by Plaintiffs are clearly established rights–both in

existing case law and as reflected in the jail's own policies, and therefore, the qualified immunity defense is not available.

To determine whether the right was clearly established, a district court looks first to Supreme Court and Ninth Circuit law existing at the time of the alleged act. *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). In the absence of binding precedent from the appellate level, the district courts should look to available decisions of other circuits and to district courts within their own circuit to ascertain whether the law is clearly established. *Id.* Looking to such precedent, it is apparent that not just the right to medical care in general, but the *specific* right to be provided with adequate treatment in a medical emergency was indeed clearly established at the time that Brian Howarth was in custody in 2014. That the general right to adequate medical treatment encompasses the more specific right to adequate treatment in an emergency was recognized by the Ninth Circuit as early as 1982.  *See, e.g. Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir. 1982) (abrogated on other grounds, *Sandin v. Conner*, 515 U.S. 472 (1995). *See also, Provencio v. Vasquez,* 258 F.R.D. 626, 637 (E.D. Cal. 2009) (collecting cases and holding that the right to emergency medical treatment under the Eighth Amendment is clearly established for purposes of the qualified immunity inquiry); *Ramos v. Lamm, 639 F.2d 559, 574 (10th Cir. 1980)* (recognizing that prisons must, under the Constitution, provide an adequate system for responding to medical emergencies); *Madrid v. Gomez,*  889

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 32**

F.Supp. 1146, 1256 (N.D. Cal. 1995) (same). In a seminal case on the subject from this Court, the Idaho Board of Corrections was ruled in violation of the Eighth Amendment where inmates at the Idaho State Correctional Institution had access to medical care for only sixteen hours a day, leaving them without the ability to obtain medical care in the event of an emergency. *Balla v. Idaho State. Board of Corrections*, 595 F.Supp. 1558, 1583 (D. Idaho 1984). It is equally well established that a prison official violates the Eighth Amendment when he or she delays or denies access to prescribed medical treatment, when doing so presents a substantial risk of serious harm. *Wakefield v. Thompson,* 177 F.3d 1160, 1165 (9th Cir. 1999); *Hamilton v. Endell,* 981 F.2d 1062 (9th Cir. 1992) (overruled on other grounds as recognized in *Snow v. McDaniel,* 681 F.3d 978 (9th Cir. 2012)). This would include delaying a return hospital visit for an inmate who had been instructed to return if his condition was worsening.

The Court's ruling in this regard is also supported by the Boundary County Detention Facility's own policies and procedures. These procedures provided that jail inmates at the jail were to be provided with necessary medical services in the event of an emergency, and also provided that "severe breathing difficulties" constituted just such an emergency. (Sprungl Aff., Dkt. 29-8, ¶ 35).

## CONCLUSION

For the reasons described in this decision, the Court finds that summary judgment

is inappropriate as to the bulk of Plaintiffs' claims, but warranted as to a portion of those claims, as further identified below.

## ORDER

1.     The Defendant's Motion for Summary Judgment (Dkt. 29) is hereby **GRANTED IN PART AND DENIED IN PART**. The motion is **DENIED** as to Defendants Colby, Elam, Pew, McClelland and Sprungl, and also **DENIED** as to Boundary County, Boundary County Detention Facility, and the Boundary County Sheriff's Office. The motion is **GRANTED** as to Defendants Van Meter, Schmitt, Hoff, and Rantlett.

2.     Defendant's Motion is also **GRANTED** to the limited extent that it challenged the legal sufficiency of supervisory liability claims against the Institutional Defendants, arising from allegedly inadequate training of detention deputies with respect to the necessity of conducting thirty minute checks on inmates. In all other respects besides those expressly mentioned in this order, the motion is denied.

3.     The remainder of Defendant's Motion to Strike (Dkt. 44), which challenged the admissibility of the Gravette Declaration on the basis that it gave impermissible opinions on ultimate legal conclusions is hereby **DENIED.** Defendants, however,

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 34**

may raise more tailored challenges to the admissibility of expert opinion on the topic of deliberate indifference in the context of pretrial motions in limine.

DATED:  **September 30, 2016**



Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT - 35**