R. Bruce Owens, ISB# 3315
Regina M. McCrea, ISB# 6845
OWENS, McCREA & LINSCOTT, PLLC
8596 N. Wayne Dr., Ste. A
Hayden, ID 83835
Telephone:  (208) 762-0203
Facsimile:  (208) 762-0303
Email: bowens@omllaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KATHLEEN HOWARTH, as personal representative of the Estate of Brian Howarth; and KATHLEEN HOWARTH, individually,<br><br>　　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>BOUNDARY COMMUNITY HOSPITAL, a Division of Boundary County; and GORDON LUTHER, M.D., an Individual,<br><br>　　　　　　　　Defendants. | Case No. 2:14-CV-00312-REB<br><br>**PLAINTIFFS' TRIAL BRIEF** |

Brian Howarth died on the morning of January, 24, 2014 as a result of bilateral pneumonia.  At that time, Howarth was serving a DUI-related sentence at the jail in Boundary County.  Detention deputies took Howarth to the emergency room of the local hospital the previous day.  His symptoms on January 23rd included diffuse wheezing, with rhonchi and shortness of breath, as well as persistent coughing with production of bloody sputum.  The emergency department nurse (Lois Vetter) noted the following:

1.  That Howarth was a long-time cigarette smoker and had a history of alcohol use;

2.  That Howarth's respiratory illness had started several days earlier and that, despite two days of an appropriate antibiotic, he was getting significantly worse;

3.  That Howarth had abnormal vital signs—a rapid heart rate, an alarmingly low level of oxygen in his blood ($O_2$ sat of 88), and shortness of breath;

4.  That Howarth had recently begun coughing up blood (hemoptysis) and his shortness of breath had significantly increased; and

5.  That on physical examination, Howarth had wheezing and rhonchi in all 5 lung fields.

With the benefit of the above clinical notations, the ER physician, Dr. Gordon Luther, recorded: (a) diffuse wheezing, with rhonchi and shortness of breath; (b) coughing up blood in his sputum; and (c) worsening symptoms despite ongoing treatment with the antibiotic Septra DS.  Dr. Luther recorded his clinical impression as "bronchitis — acute asthmatic."  To this clinical impression, he also added "rule-out pneumonia," but did not obtain any diagnostic tests, such as a chest x-ray or bloodwork that would have served to "rule-out pneumonia."  Rather, he ordered a single, short (one minute) treatment with a bronchodilator/nebulized Albuterol.  Nine minutes later, Howarth's vital signs had minimally improved ($O_2$ rose to a still low level of 94%).  Dr. Luther did no further treatment or diagnostic evaluations, but prescribed Zithromax and an inhaler[1] and discharged Howarth back to the jail with these instructions:

**Instructions for: HOWARTH, BRIAN**
**Date: 01-23-2014   Time:        Physician: Gordon Luther, M.D.**

BRONCHITIS WITH BRONCHOSPASM (WHEEZING):
   You have  bronchitis with bronchospasm (wheezing).  Sometimes people develop wheezing with a chest cold.  This occurs either because of an underlying tendency toward asthma or because the virus itself irritates the bronchial tubes.  This irritation causes cough, shortness of breath, and wheezing.
   Emergency treatment of bronchospasm may include adrenaline shots or bronchodilator aerosol.  You may feel lightheaded and have a rapid pulse for an hour or two.  Rest and get plenty of fluids.
   At home, we'll treat you with a bronchodilator inhaler. Corticosteroids may be required for some patients. Until you recover, avoid chemical fumes, dusts, pollens, and exercising in very cold or dry air. If you smoke, stop now!
   Most cases of bronchitis get better without antibiotics.  We prescribe antibiotics when we believe bacteria are damaging your airways, or if there's high risk the bronchitis will worsen into pneumonia. Increase your fluid intake. A cool mist humidifier may make your lungs more comfortable.  An expectorant (cough medicine that loosens phlegm) can help.
   Repeated episodes of bronchitis and bronchospasm may result in lung damage -- for example, chronic bronchitis, recurrent pneumonias, or emphysema. If you develop a fever, increased wheezing, chest pain, or severe shortness of breath, you should contact the doctor immediately.

REST, FLUIDS, START NEW ANTIBIOTIC (ZITHROMAX) TOMORROW MORNING IN ADDITION TO YOUR CURRENT ANTIBIOTIC.  USE INHALER AS NEEDED.  RETURN HERE IF WORSENING.

---

[1] Bronchodilator/Nebulizer

Detention Deputy Elam acknowledged receipt of Dr. Luther's discharge instructions.

In the view of Plaintiffs' experts, had Dr. Luther obtained a chest x-ray or delayed returning Howarth to the jail until his condition was stable, then, more probably than not, Howarth would have made a complete recovery and would not have died.

## LEGAL AND EVIDENTIARY ISSUES ANTICIPATED AT TRIAL

### I. Defendant Gordon Luther, M.D. negligently failed to meet the applicable standard of health care practice in his treatment of Howarth.

Defendant Dr. Luther negligently failed to meet the applicable standard of health care practice in rendering treatment to Howarth in the emergency room on the morning of January 23, 2014. At trial, a plaintiff in a medical malpractice matter must present expert testimony that the defendant "negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was . . . provided, as such standard existed at the time and place of the alleged negligence of such physician." I.C. § 6-1012. In offering such expert evidence, a plaintiff must further show that his or her expert holds the opinion, to a reasonable degree of medical certainty, that the standard of care was violated and that said expert "possesses professional knowledge and expertise coupled with actual knowledge of the applicable said community standard." I.C. § 6-1013. To acquire "actual knowledge," an out of area expert may familiarize himself with the standards and practices employed in the community and, thereafter, would be allowed to express his opinions at trial. *Id.* In order to demonstrate that the out of area expert has sufficient familiarity, he must describe how he acquainted himself with the standard of care as it existed in the relevant community at the time of the alleged negligence. *Dulaney v. St. Alphonsus*, 137 Idaho 160, 164, 45 P.3d 816, 820 (2002).

"The standard of care is simply the care typically provided under similar circumstances by the relevant type of health care provider in the community at the time and place of the alleged

negligent act." *Shane v. Blair*, 139 Idaho 126, 130, 75 P.3d 180, 184 (2003).  Stated another way, the standard of care is "what a reasonably prudent physician in the same or similar circumstances would do."  *Krivchenia v. Karl*, 600 S.E.2d 315 (W. Va. 2004) (discussing with favor the holding of *Shane v. Blair*).

Reviewing depositions of local physicians is an obvious and accepted means to acquire knowledge about the standard of care in the relevant community.  *See Shane*, 139 Idaho at130, 75 P.3d at 184; *Perry v. Magic Valley Reg'l Med. Ctr.,* 134 Idaho 46, 51—52, 995 P.2d 816, 821—22 (2000); *Rhodehouse v. Stutts*, 125 Idaho 208, 212, 868 P.2d 1224, 1228 (1994); *see also Grover v. Smith*, 137 Idaho 247, 252, 46 P.3d 1105, 1110 (2001) ("This Court has never held that an expert must speak with a professional who practiced in the same geographic area as the defendant to become familiar with the local standard of care.").  However, the deposition testimony being relied on must sufficiently articulate "the local standard for the particular time, place and specialty at issue in order to meet the foundational requirements of I.C. § 6-1013." *Suhadolnik v. Pressman*, 151 Idaho 110, 117—18, 254 P.3d 11, 18—19 (2011).

According to the Idaho Supreme Court, out of area experts "can meet the foundational requirement of personal knowledge by inquiring of a local specialist regarding the standard of care." *Id.* at 116, 254 P .3d at 17; *see also Keyser v. Garner,* 129 Idaho 112, 117—18, 922 P. 2d 409, 414—15 (Ct. App. 1996) (holding out-of-state experts are merely required to "become familiar" with the standard of care of the community).  The out of area expert can "make inquiries to another out-of-area specialist, so long as that specialist has had sufficient contacts with the area in question to demonstrate personal knowledge of the local standard." *Suhadolnik*, 151 Idaho at 116, 254 P.3d at 17.  "If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho

communities at said time may be considered." I.C. § 6-1012.  Per precedent, even communities outside Idaho can suffice in fulfilling the statutory requirement. *Lepper v. E. Idaho Health Servs., Inc.*, 160 Idaho 104, 115, 369 P.3d 882, 893 (2016), *reh'g denied* (Apr. 15, 2016); *Hoene v. Barnes*, 121 Idaho 752, 756, 828 P.2d 315, 319 (1992),

Regardless of the foregoing, medical professionals in a community cannot adopt standards that are inferior to statewide standards.  *Id.* at 253, 46 P.3d at 1111.  Additionally, the local standard of care may be governed by a national standard.  *Kozlowski v. Rush*, 121 Idaho 825, 828-29, 828 P.2d 854, 857—58 (1992).  Given increased communication, governmental regulation, development of regional and national provider organizations, and the wide availability of medical information, all of which results in more standardization of practices, even in rural communities, local standards will frequently not vary from national standards. *See Suhadolnik*, 151 Idaho at 121, 254 P.3d at 22.  With respect to the provision of emergency medical care, the federal government has enacted minimum national standards applicable to "participating hospitals," defined as hospitals who have "entered into a provider agreement" under which they accept payment from the Department of Health and Human Services, Center for Medicare and Medicaid Services (CMS).  EMTALA, Section 1867(a) of the Social Security Act, codified at 42 U.S.C. § 1395dd (effective 10/21/11).  The import of EMTALA is discussed at greater length below, but, put simply, it requires providers of hospital emergency services to conduct an appropriate medical screening examination and to stabilize or transfer patients with emergency medical conditions.

Boundary Community Hospital is a participating hospital:

---



Bonners Ferry, Idaho

**EMTALA**
Policy Title

| | Medical Staff | Department |
|---|---|---|
| | General | Category |
| | 05/31/13 | Orig. Date |
| | 05/31/13 | Effect. Date |
| | 02/20/15 | Rev. Date |

**Purpose:** To ensure that Boundary Community Hospital complies with the requirements of the Emergency Medical Treatment and Active Labor Act (EMTALA) and associated regulations. (42 U.S.C. § 1395dd and 42 C.F.R. § 489.20, - 24). Additional information is available in the CMS Interpretive Guidelines at http://www.cms.hhs.gov/surveycertificationgeninfo/downloads/SCLetter 08-15.pdf

**Applies to:** Any patient that presents at the hospital and request is made for examination or treatment of a medical condition.

**Responsibility:** Emergency Department Registered Nursing Staff, Physicians, Registration Clerks, Ancillary Departments, Administrator and Chief Nursing Officer

McCrea Decl. ¶ 5.

Only recently, the Idaho Supreme Court agreed that "experts are not confined to some formulaic process for becoming familiar with the community standard of health care practice." *Samples v. Hanson*, 161 Idaho 179, 183, 384 P.3d 943, 947 (2016). Courts are not to require "magic language" or particular phrasing. *Id*, 384 P.3d 947. Rather, in addressing the question, the court "must look to the standard of care at issue, the proposed expert's grounds for claiming knowledge of that standard, and determine—employing a measure of common sense—whether those grounds would likely give rise to knowledge of that standard." *Id.* at 185, 384 P.3d at 949. The standard of care at issue in *Samples* "was largely a matter of common sense" and was "not complicated." *Id.* at 185—86, 384 P.3d at 949—50. As the *Samples* court explained, "One would hope that any surgeon regardless of whether operating in the backwoods or a metropolitan hospital, would monitor the patient post-operatively to ensure a decent recovery without infection or complication." *Id.* at 186, 384 P.3d at 950.

This Court determines the admissibility of expert witness testimony. *See Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 50—51, 995 P.2d 816, 820—21 (2000). In the present case, Plaintiffs initially retained and disclosed six experts: of which 2 had opinions on Dr. Luther's failure to adhere to the applicable standard of care, 2 would render causation opinions, 1 dealt with jail standards of practice, and 1 had quantified economic losses. Plaintiffs' standard of care experts are Eric Johnson, M.D. and Richard Cummins, M.D. To familiarize themselves with the case and with the local community standard of care, these physicians reviewed medical records from Boundary Community Hospital (dated 1/23/14 and 1/24/14) and from Dr. Troy Geyman (the jail's contract physician), as well as the autopsy report prepared by Spokane County Medical Examiner Dr. John D. Howard. In addition, plaintiffs' experts reviewed numerous depositions and have ample support for their testimony to be admitted at trial.

### 1. Medical Records

Defendant Dr. Luther recorded his clinical impression on 1/23/14, as follows:



BCCH 1/23/14 - 15

As is plain from the above excerpt, Dr. Luther concluded Howarth had "bronchitis—acute asthmatic" and made the further notation to "R/o pneumonia," meaning "rule out pneumonia."

### 2.  Deposition Testimony

Drs. Johnson and Cummins also rely on the deposition testimony of the following individuals:

- Gordon Luther, MD;

- Chuck Newhouse, MD;

- Troy Geyman, MD;

- Lois Vetter, RN;

- Kathleen Howarth;

- Gerald Clark (Howarth's cellmate);

- Craig Bosley, M.D. (an expert retained by Dr. Luther); and

- Andrew Sullivan, M.D. (same).

This testimony provides detail about relevant prevailing standards and practices of healthcare.

### a.  Gordon Luther, MD

Dr. Luther is board-certified in family medicine, but has focused his practice exclusively on emergency medicine.  He has been licensed in Hawaii, Washington, Oregon and Idaho (Ex. A to McCrea Decl. at 25—26) and has approached the treatment of patients with upper respiratory symptoms the same no matter in which state he happened to be practicing.  *Id.* at 54—55.  Moreover, he agreed that his care of patients presenting with upper respiratory infections is no different at Boundary Community Hospital in Bonner's Ferry or at Kootenai Health in Coeur d'Alene.  *Id.* at 34—35.  Both facilities had the requisite diagnostic tools available, such as x-ray and blood cultures.  *Id.* at 33—34.  In continuing education courses he has taken on treating

upper respiratory infections, the presenters give the same instructions regardless of the locale involved.  *Id.* at 31.  Additionally, whether the physician providing emergency care is board-certified in family practice or in emergency room medicine, their practices do not vary when treating emergency room patients.  *Id.* at 27—28.

Dr. Luther agreed that a tenet of his medical school training was to include pneumonia in the differential diagnosis when a patient presents with decreased $O_2$ sats, tachycardia, hemoptysis, shortness of breath, headache, wheezing, rhonchi, and rales.  *Id.* at 36.  Dr. Luther further agreed that chest radiography plays an important role in diagnosing pneumonia.  *Id.* at 43. In seeking to rule out pneumonia, the first step is a chest x-ray.  *Id.* at 49.  Not only that, a chest x-ray is the easiest and most commonly used modality for diagnosing pneumonia.  *Id.* at 63—64. Blood testing can also be helpful to the diagnostic process.  *Id.* at 65.  Dr. Luther classifies pneumonia as a serious and life threatening condition.  *Id.* at 36.  He believed Howarth had pneumonia when he treated him on the morning of January 23, 2014.  *Id.* at 60.  Additionally, Dr. Luther thought it likely that had a chest x-ray been performed on Howarth on January 23, 2014, it would have indicated pneumonia.  *Id.* at 65.

Dr. Luther readily acknowledged that patients who have $O_2$ saturation levels between 88 and 90 are usually hospitalized.  *Id.* at 52—53.  Howarth's $O_2$ level on the morning of January 23, 2014 was 88:

```
Vital Signs
     Adult/Pediatric
        Temperature (35.0 C-38.3 C)                 36.1 C
        Temperature Source                          Temporal Artery Scan
        Pulse Rate (60-100 beats/min)               104
        Pulse Source/Location                       Monitor
        Blood Pressure (90/60-140/90 mm Hg)         128/69
        Blood Pressure Source/Location              Right Arm
        Blood Pressure Mean (mm Hg)                 88
        Respiratory Rate (12-24 breaths/min)        16
        O2 Sat by Pulse Oximetry (88-100 %)         88
        Oxygen Delivery Method                      Room Air
```

Excerpt from Boundary Community Hospital Record, 1/23/14.

**b.   Chuck Newhouse, MD**

Dr. Newhouse is an emergency room physician at Boundary Community Hospital.  Ex. B to McCrea Decl. at 12—13.  Dr. Newhouse testified that chest x-rays are used to diagnose pneumonia.  He explained their utility as follows: "It permits imaging of the heart and lungs in that particular situation where you're investigating the possibility of pneumonia.  And one can see changes on the X-ray that suggest that a pneumonia might be present."  *Id.* at 32.  He also agreed that "a chest x-ray is an important and critical modality in diagnosing pneumonia."  *Id.* at 56.  He testified that he would be concerned if he had a patient present in the emergency room with hypoxia and an oxygen saturation level below 91 percent.  *Id.* at 39—41.  Last, he indicated that adults similar to Howarth are considered tachycardic if their heart rate is greater than 90 beats per minute.  *Id.* at 41—42.

**c.   Craig Bosley, MD**

Dr. Bosley is a board-certified emergency room physician who has been retained by Defendant Dr. Luther to render expert opinions at the time of trial.  According to Dr. Bosley and based upon his conversation with Dr. Ettner, an emergency department physician with Western Medical Associates, "the standard of care at Boundary Community Hospital back in 2014" was not any different than that at Portneuf Medical Center (which is located in Pocatello, Idaho).  Ex. C to McCrea Decl. at 37—38.

**3.   Substance of the foundation of Dr. Johnson's testimony**

Dr. Eric Johnson is a board-certified family physician who practices emergency medicine.  He is licensed in Idaho and Montana and holds an inactive license to practice medicine in Oregon.  In January 2014, he was affiliated with the following hospitals: St.

Alphonsus Medical Center, in Boise and Nampa, Idaho; Teton Valley Hospital in Driggs, Idaho; Southwest Hospital in Boise, Idaho; and Vibra Hospital in Boise.  In addition, beginning in January 2015, Dr. Johnson was also affiliated with Walter Knox Memorial Hospital in Emmet, Idaho.  He has provided emergency care in Driggs, Emmett, Nampa, Meridian, and Boise.  He has spent his entire medical career (since August 1987) in Idaho, predominantly throughout southern and eastern Idaho.  *See* Ps' Witness List and exhibit 2 thereto.

Dr. Johnson's deposition was taken on February 8, 2016.  Defendant Dr. Luther's attorney asked him to articulate "the standard of health care practice that existed on January 23rd, 2014, in the area ordinarily served by Boundary Community Hospital."  This answer and colloquy followed:

> I would answer that question by first stating federal law which applies to every emergency department.  Back in '86 when EMTALA came in, every emergency department is required to do an obligate medical screening examination on every patient coming into the emergency department.  And you're to do the appropriate testing, whatever it takes to define a potentially acute medical emergency.  And that is defined as something that could lead to an adverse outcome in a short period of time or a bad outcome, basically be defined as limb and life threatening.  So even though Idaho has a local standard of care, EMTALA and federal law mandates that in an emergency department that standard of care would apply.
>
> Q.     What does EMTALA require that a medical screening exam consist of?
>
> A.      To do the necessary testing to rule out emergency medical conditions. That's the language.  So that may mean that you have someone who has chest pain, and they may have to go all the way through an angiogram to rule out that they didn't have an acute coronary syndrome. If you can do that short of EKG, laboratory, everything else, that's great. If you can't, you're obligated to rule out those emergency medical conditions.
>
> Q.     In this case what emergency medical conditions needed to be ruled out?
>
> A.     Well, I think that a gentleman, in my review of the emergency record, shows potentially a gentleman who – again, I'm not going to repeat myself but basically has had an illness for a period of time, seen two days prior to an emergency department visit, with kind of potentially upper-respiratory-type symptoms and then two days later now presented with lower respiratory symptoms. I think if I recall the records correctly, kind of a sinusitis diagnosis on the 21st, if my memory serves me correctly.

On the 23rd seen in the emergency department, he now presented with a significantly – what I perceived as a significantly productive cough. He certainly was hypoxic at that point and complaining of, you know, symptoms and to be – found to be somewhat tachycardic. And I think at that point he needed a workup to rule out emergency medical pulmonary conditions. That would be, I would believe, the standard of care.

Q.    What did that workup need to consist of?

A.    . . . In the emergency department, remember, we are the triage. We are determining who is going to do well and who is not going to do well. And our job is to determine that. That is our job. We're not obligated to treat a middle ear infection unless we think it's an emergency medical condition. We can triage them out, and they can be seen the next day by their pediatrician. We all do for convenience and for goodwill to the hospital and patients. But in general, our job is to rule out emergency medical conditions.

It is my clinical opinion that the sensitivity of looking at lower respiratory, rule out infections or other processes, the highest sensitivity specificity test one can do is a simple chest X-ray.  And I believe these symptoms without hesitation based on the American Thoracic Society, the International Society of Infectious Disease, the American College of Emergency Physicians, even the American Academy of Family Practice in many articles have listed over the years, there have been guidelines written on this, that if you're looking at lower respiratory ruleout, so to speak, chest X-ray is mandated. And I believe that would have been dramatically telling in this case.

Ex. D to McCrea Decl. at 9—13.  Dr. Johnson is familiar with the electronic records system used by Boundary Community Hospital.  He explained that the Emergency Physician Record (T-Sheet) contains a clinical toolbox for the clinician's use.  Two of the tools are the CURB-65 and the PORT scale, which are nationally recognized pneumonia severity scales.  However, Dr. Luther did not complete that portion of the chart:

*Id.* at 25—28.  Per Dr. Johnson, Howarth had a lower respiratory tract problem, and Dr. Luther was "obviously" considering pneumonia because he wrote "rule out pneumonia" in the chart. Dr. Johnson has seen that phrasing for over 20 years in the emergency department and explained it thusly:

> Rule out means you rule it out.  And by listening to lungs with wheezes and diffuse rhonchi, that he had better air movement after his DuoNeb, but still had rhonchi, my impression and my belief is that [Dr. Luther] did not rule out pneumonia.  And clearly at that point a chest X-ray was indicated.  He diagnosed him with acute bronchitis.  Put him on Zithromax and an albuterol MDI neb and discharged him.

*Id.* at 36.  In addition, Howarth was not clinically stable[2] at the time of his discharge because he had not been observed long enough.  The recheck of his oxygen saturation level within 30 minutes of completion of the DuoNeb treatment did not convey how Howarth would progress thereafter.  *Id.* at 38—40.

Stated another way, but continuing to implicate Dr. Luther's EMTALA obligations to screen appropriately and provide necessary stabilizing treatment, Dr. Johnson summed up his opinions as follows:

> [Howarth] was sick for four to five days, subjective fever, seen two days prior, not responsive to Septra.  Hypoxemia, rhonchi on initial exam with all lung fields, expiratory wheezes, post-DuoNeb therapy, still with rhonchi, and recurrently a history of bringing up more and more productive sputum that's been blood tinged. That tells me you don't know the diagnosis [and] rule[d] out an acute medical emergency. And in this case the most sensitive and specific test that would have been indicated would have been a chest X-ray.

*Id.* at 49.

> [Howarth] at 88 percent on room air meets all the criteria for a hypoxic patient. Now, you could say, well, that may be related to his smoking, but you don't know what his baseline is.  So in emergency medicine, that's why we tend to be accused of over-testing because we don't have histories.  We don't know their

---

[2] To conform with the directives of federal law (EMTALA), a hospital is obligated to provide treatment to a patient until his or her condition is stable or he/she is transferred to another hospital.

baselines, and yet we're still obligated to rule out those acute medical emergencies.

*Id.* at 76.

Dr. Johnson also discussed his relationship with emergency room physicians in Coeur d'Alene (the area where Dr. Luther predominately practices), indicating he had gone to college with a couple of them and has discussed the practice of care in Coeur d'Alene.  His testimony continued, to wit:

> I have been in Coeur d'Alene. I know these guys. The fact is I have not worked there. I believe in this kind of case your local standard of care in Idaho is . . . I don't believe Boundary County Hospital is going to do anything different than Coeur d'Alene should do anything different than Arco, than Driggs, than Emmett, than Weiser.  I believe a gentleman who comes in with these kinds of symptoms in any of these facilities warrants a chest X-ray after this history and physical examination.

*Id.* at 65.

In a case relatively similar to the one at bar and decided in this district last year, United States Magistrate Judge Candy W. Dale concluded Dr. Eric Johnson had actual knowledge of the standard of care throughout Idaho, both in Level II trauma centers and rural hospitals, as well as everything in between.  Consequently, the plaintiffs' out of area physicians who had consulted with Dr. Johnson had adequately established foundation for their familiarity with the applicable standard of care as it existed in Coeur d'Alene during the relevant period.  *Garriott v. W. Med. Assocs., PLLC*, No. 2:16-cv-00081-CWD, 2017 WL 3288596 (D. Idaho Aug. 2, 2017).  As discussed, Defendant Dr. Luther principally practices in Coeur d'Alene and was providing emergency room services at Boundary Community Hospital in January 2014 as a courtesy because of short-staffing.  Ex. A to McCrea Decl. at 12—16.

### 4.  Substance of the foundation of Dr. Cummins' testimony

Dr. Richard Cummins has been continuously board-certified in emergency medicine in Washington since 1996 and provides emergency medicine services at the University of Washington Medical Center in Seattle.  Washington has affirmatively adopted a statewide standard applicable to all health care providers.  RCW § 7.70.040 (mandating that health care providers must exercise the "degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs *in the state of Washington . . .*") (emphasis added).  It is worth noting that Dr. Luther received his medical training in Washington and completed his residency there.  His deposition testimony reflects that his practice in Idaho has not differed in any material respects from how he practiced medicine in Washington.

In addition to reviewing the materials mentioned above (medical records, depositions, and select written discovery), Dr. Cummins consulted with Dr. Eric Johnson, a board-certified family physician who has practiced emergency medicine for over thirty years in various parts of Idaho and has served as the director of the emergency department at Walter Knox Memorial Hospital in Emmett, Idaho for the past several years.  Dr. Cummins discussed with Dr. Johnson "the diagnosis, care, and treatment of patients presenting similar to the symptoms, signs, and medical history Brian Howarth presented with on January 23, 2014."  Dr. Johnson confirmed that his background, education, and training is similar to that of Dr. Luther—they are both board certified in family practice by the American Board of Family Practice and primarily practice emergency medicine.  Both are licensed physicians in the State of Idaho, and both have practiced in rural and suburban areas of the state.  *See* Ps' Witness List and exhibit 1 thereto.

Dr. Cummins gave a deposition in this proceeding on February 24, 2016.  Beyond interviewing Dr. Johnson, he expounded on his familiarity with the standards of practice in small towns in Idaho, explaining:

> Well, it's based upon my experience as a physician and a teaching faculty member at the University of Washington.  I have traveled to places in Idaho to deliver lectures.  We have this affiliation at the University of Washington, the WWAMI program, and there are faculty members that get invited to some of those sites.  I've also given lectures as part of my work with the American Heart Association and National Chair of the Emergency Cardiovascular Care and Advanced Cardiac Life Support Program.  It's given me an opportunity to talk with doctors practicing in that setting.  I've had experience myself with two years in practice in a small 20-bed hospital in rural Virginia, which I think is somewhat analogous to the Boundary County setting.  I'm also responsible for a number of family practice doctors who go into practice in Idaho through the WWAMI program, and have gone back to that since I'm responsible for helping them become familiar with what the standard of care is which they will then bring back to the practice settings that they have in Idaho.

Ex. E to McCrea Decl. at 9—10.  After acknowledging both Dr. Luther and Dr. Newhouse's testimony that x-ray is not required in *every* case, the following exchange occurred:

> Q.    What puts Brian Howarth in the group that requires a chest x-ray?
> A.    The whole clinical presentation, the prior history.  He was quite a complicated presentation.  The risk factors, complications of pneumonia.  He was a smoker.  He was in a confined population, in a prison population, which is known to have increased risk for the spread of MRSA, for example.  He was probably an alcoholic, which exposes people to certain risks of complications like aspiration-type of pneumonia, and he was presenting with two quite remarkable abnormalities.  Number one, he was short of breath and he was hypoxic.  He had documented low levels of oxygen in his blood.  And he was complaining of coughing up blood.  Those complaints, that kind of clinical picture right off the bat is going to be hard not to get a chest x-ray in a person presenting like that.  If you add to it a number of other clinical factors that were relevant, it becomes even more mandatory and imperative that the extent of his disease be explored in a conscientious standard of care manner by an emergency care physician.
> Q.    What other factors were there?
> A.    Number one, he had been ill for well over a week when he was admitted to the jail.  I'm not sure if "admitted" is the right term.  But on January the 14th when he came in, he was already ill.  He had a respiratory infection.  He was seen two days prior to the time he saw Dr. Luther by Dr. Geyman on a sick call with a variety of complaints that were respiratory in nature, confirming that he

had had a respiratory infection going on for close to two weeks.  Dr. Geyman
started him on an antibiotic that would be reasonable to treat some bacterial
types of infections, and yet he was getting worse.  He was not getting better.  He
had, added to that, the complaint of the coughing up blood, which is always kind
of an alarming red-flag type of complaint that needs to be explored.  So those
are kind of the contexts of his presentation on the morning of the 23rd of
January to Dr. Luther.

*Id.* at 13—15.  Dr. Cummins' testimony is consistent with both Dr. Luther and Dr. Newhouse in
that Howarth's hypoxia was a significantly concerning symptom.  Dr. Cummins explained that
an adult male should be able to oxygenate at a much higher rate than 88%.  Howarth's inability
to do so implicated a pathological process in the lungs that was preventing oxygen from getting
into the bloodstream.  *Id.* at 33—34.

Dr. Cummins also explained the purpose of the CURB-65 score, a nationally recognized
pneumonia severity index scale (which was left blank on the toolbox portion of Howarth's
emergency room record from 1/23/14 (see Discussion p.13, *infra*)):

Q.    The CURB-65 score doesn't have any mention of a chest x-ray, does it?
A.    No, the score doesn't.  But you're using the score in somebody that's got a
pneumonia.  And the starting point is they've got a pneumonia [confirmed] by
chest x-ray.  That's critical in all of these scales.  And so, then, the question of
score – the PORT study[3] out of Duke that created the PSI, which is the most
respected one, that whole thing is, you've got pneumonia: do you need to be
admitted?  And so those scales, those severity scores, are helping you with that
decision:  do they need to be admitted?  They're not helping you with the
decision:  do they or do they not have a pneumonia?  It's: do they or do they not
have a pneumonia that requires admission?
Q.    Okay, so the first predicate is:  Has there been a chest x-ray to confirm a
pneumonia?
A.    Correct.
Q.    And you can't confirm a pneumonia without a chest x-ray?
A.    That's the starting point for those types of formal studies.
Q.    Okay.  And if there is a confirmed pneumonia, then the decision whether
to admit is based on the factors in either the PSI or the CURB-65 or whatever
scale you're going to use?
A.    Correct.

---

[3] The PORT scale is also auto-generated on Boundary Community Hospital's Emergency Department Emergency
Physician Record.  *See* p.13 *infra*.

*Id.* at 42—43.

Finally, Dr. Cummins addressed the obligation an emergency department physician has to determine patient stability prior to discharge—

> [I]t was such an abbreviated, truncated visit that really doesn't establish how stable Mr. Howarth was.  There was no way in which you could say this was a stable, hypoxic person presenting with hemoptysis when he was there for less than – he was physically in the ER, I think, for 61 minutes.  The amount of time he was being assessed, say from the time Nurse Vetter started assessing him to the time Dr. Luther said, "Okay, it's time to discharge," was probably like 45 minutes, maybe 50 minutes.
> And there's no way a person presenting the alarming red-flag complaints that he had – oxygen saturation of 88, coughing up blood, "I'm sick and getting sicker" despite antibiotics – there's no way you can say that's a stable person who's ready to go home after 45 or 50 minutes.

*Id.* at 36.  Had Howarth remained in the ER for a longer period of observation to determine his stability (specifically whether his oxygen level deteriorated following the effects of the nebulizer treatment wearing off), it is reasonable and probable that Dr. Luther would not have discharged Howarth back to the jail.  *Id.* at 46—47.  Further, in Dr. Cummins' opinion, the results of a chest x-ray would have been markedly abnormal, which also would have altered Howarth's treatment course and the decision to return him to the jail.  *Id.*

A basic tenet of emergency room care is to address the condition that carries the greater risk of significant morbidity or mortality.  A fundamental departure from accepted practices of emergency medicine is settling on a differential diagnosis containing two conditions that are not clinically equivalent, such as bronchitis and pneumonia, which Defendant Dr. Luther chose to do.  The more serious condition must be addressed and cannot be left hanging.  *Id.* at 65; *see also id.* at 53 (reiterating that discharge cannot occur in the emergency room setting until the physician has determined "what's going on").

### 5.   Indeterminable Exception

The relevant Idaho statute contains an exception to the requirement for actual knowledge of the local community standard of care—"If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered."  I.C. § 6-1012.  In *Hoene v. Barnes*, 121 Idaho 752, 828 P.2d 315 (1992), the Idaho Supreme Court applied this language and cautioned that sections 6-1012 and 6-1013 of the Idaho Code should **not** be utilized to shield health care providers from suit.  *See also Dulaney v. St. Alphonsus*, 137 Idaho 160, 173, 45 P.3d 816, 829 (2002) (Kidwell, J. dissenting) ("Physicians are reluctant to testify against their fellow local physicians. Consequently, too rigidly enforcing the requirements set forth in the code provisions could serve to make it impossible for out of state experts to familiarize themselves with the local standard of care.  This could ultimately preclude plaintiffs . . . from bringing medical malpractice claims against . . . physicians under any set of facts.").   By way of further illustration, the following language from *Frank v. E. Shoshone Hosp.*, is often quoted:

> [I]t does not take a Herculean effort for an expert to become familiar with the local standard of care.  It can be done on the telephone. Moreover, if the plaintiff's expert cannot find a doctor from the local community to inform him or her of the local standard of care, I.C. § 6-1012 provides that where the standard of practice is 'indeterminable, evidence of such standard in similar Idaho communities at said time may be considered.'

114 Idaho 480, 484, 757 P.2d 1199, 1203 (1988) (Huntley, J. concurring).

The relevant phrase "if there be no other like provider in the community" is not defined in the statute.  Per the holding of *Hoene*, if there are no other similar providers in the community, then a plaintiff is entitled to look to similar Idaho communities.  *Hoene*, 121 Idaho at 752, 828 P.2d at 315; *see Morris v. Thomson*, 130 Idaho 138, 937 P.2d 1212 (1997).  In *Hoene*, the only cardiovascular surgeons in the community practiced together as one professional association.

"Because [the] physicians all practiced together and were part of one business entity," they were treated "as one provider under the statute."  121 Idaho at 754, 828 P.2d at 317 (reasoning also that the legislature did not intend to insulate physicians from medical malpractice claims).

The Idaho Supreme Court recently applied the *Hoene* rule to account for "conspiracies of silence."  *Lepper v. E. Idaho Health Servs., Inc.*, 160 Idaho 104, 369 P.3d 882 (2016), *reh'g denied* (Apr. 15, 2016).   In that case, the plaintiffs had made concerted efforts to locate a neurosurgeon in the community where the care had been provided (Idaho Falls) and within the state of Idaho to consult with their out of area expert.   No neurosurgeon would discuss the standard of care with the Leppers' expert.  *Id.* at 115, 369 P.3d at 893.   Therefore, they turned to a neurosurgeon located in Billings, Montana, but the trial court refused to consider such basis as having sufficiently qualified the Leppers' expert to render standard of care opinions.   The Idaho Supreme Court reversed, reasoning the *Hoene* exception should apply "in circumstances here where every neurosurgeon in Idaho either declines to opine as to the standard of care or simply does not respond."  *Id.*, 369 P.3d at 893 (noting further that the common law locality rule is not limited to similar communities within Idaho).

In the case at bar, Defendant Dr. Luther practices with a group of physicians at Western Medical Associates, which entity provides exclusive coverage for the emergency department of Kootenai Health in Coeur d'Alene.  Ex. A to McCrea Decl. at 6—7; 10.  In January 2014, Dr. Luther would, on occasion, staff the emergency room of Boundary Community Hospital.  *Id.* at 12—13.  The hospital was included as a defendant in this action because it is vicariously liable for physicians who perform inherent functions of the hospital, such as the provision of emergency room services to the community.  *See, e.g., Jones v. Healthsouth Treasure Valley Hosp.*, 147 Idaho 109, 206 P.3d 473 (2009); *Adamski v. Tacoma Gen. Hosp.*, 20 Wash. App. 98,

579 P.2d 970 (1978); the Restatement (Second) of Agency; the Restatement (Third) of Agency; *see also* Dkt. No. 50 ("Order Adopting Stipulation to Dismiss Plaintiffs' Claims Concerning the Boundary Hospital Nursing Staff") (acknowledging that plaintiffs' vicarious liability claim against the Boundary Community Hospital remained at issue).

In written discovery, Plaintiffs asked the hospital to list "all physicians who provided emergency room services at any time from January 2013 to December 2014 on an independent contractor basis." Ex. F to McCrea Decl. at 2. In its answer, the hospital identified the following physicians: Charles Fooe, MD; Gordon Luther, MD; James Davidson, MD; Kenneth Gramyk, MD; Michael Ettner, MD; Robyn Hitchcock, MD; Thomas Nikol, MD; Tricia Dickens, MD; Vincent Huntsberger, MD; and William Wheeler, MD. *Id.* Of these 9 providers (with Dr. Luther excluded), three work with Defendant Dr. Luther at Western Medical Associates. Ex. A to McCrea Decl. at 15—16 (identifying Dr. Ettner, Dr. Fooe, and Dr. Nickol as members of his group who provided services in the emergency room of Boundary Community Hospital).

To aid plaintiffs' out of area experts in becoming familiar with the local community standard of care applicable to the present matter, Plaintiffs' counsel contacted every independent provider of emergency room services at Boundary Community Hospital not affiliated with Defendant Dr. Luther's clinic or employed by the Defendant Hospital. The vast majority of contacted providers did not reply, and those who did respond indicated an unwillingness to discuss the local community standard of care with plaintiffs' experts. Aff. of McCrea and attachments thereto identified as Exhibit G. As a consequence, and despite counsel's concerted efforts, the community standard of care could not be determined through consultation with local providers. Accordingly, plaintiffs' counsel arranged for Dr. Richard Cummins to confer with Dr. Eric Johnson, whose Idaho background and experience has been discussed above. As shown,

both Dr. Cummins and Dr. Johnson have familiarity with prevailing standards of emergency medicine in rural communities, like Bonner's Ferry, Idaho, as the same existed on or about January, 2014.  *See, e.g,* Ps' Witness List and exhibits 1—2 thereto.

## II.   Plaintiffs' evidence supports the giving of a reckless instruction.

Plaintiffs contend that the actions of Dr. Luther were more than negligent—they were reckless.  The Idaho Supreme Court has held that reckless conduct "is simply a degree of negligence . . . that involves both intentional conduct and knowledge of a substantial risk of harm."  *Hennefer v. Blaine Co. Sch. Dist.*, 158 Idaho 242, 248, 346 P.3d 259, 265 (2015) (citing *Carrillo v. Boise Tire Co.*, 152 Idaho 741, 751, 274 P.3d 1256, 1266 (2012)).  There is no distinction between conduct that is "reckless" and "willful and wanton."  *Id.*, 346 P.3d at 265.  The actor need only "make a conscious choice as to his or her course of action."  *Id.* at 249, 346 P.3d at 266.

The standard of reckless conduct is an objective one, rather than subjective.  *Id.*  In *Phillips v. Erhart*, 151 Idaho 100, 108, 254 P.3d 1, 9 (2011), the Court held a finding of reckless does *not* require the jury to find that the Defendant "subjectively knew of the high probability of harm. It would be sufficient if he should have known that his actions created a high probability that harm would actually result."

The Idaho Supreme Court recently determined that direct expert testimony on recklessness is not required in a medical negligence cases. *Ballard v. Kerr*, 160 Idaho 674, 710, 378 P.3d 464, 500 (2016).  The Court reasoned,

> Once an expert has opined as to the applicable standard of care and how a defendant's conduct breached that standard, in many cases a lay person could determine whether a defendant made a conscious choice to engage in such conduct and whether the risk and high probability of harm were objectively foreseeable. Silk Touch's argument that not requiring direct expert testimony to prove recklessness would allow plaintiffs to run around the requirements of

section 6–1012 is unavailing. The jury could only find that Silk Touch's conduct was reckless once it determined that Silk Touch had breached the applicable standard of care and that the breach was the proximate cause of Krystal's death. In a medical malpractice action, a finding of recklessness cannot be made unless a plaintiff first proves that a defendant breached the standard of care as defined in section 6–1012.

*Id.*, 378 P.3d at 500.

The appropriate instruction for reckless is as follows:

"Reckless" when applied to the allegations in this case means more than ordinary negligence. Conduct is reckless when the defendant made a conscious choice as to his or her course of action under circumstances where he knew or should have known that such action created a high probability that harm would actually result. The term "reckless" does not require an intent to cause harm.

The following facts illustrate that a reckless instruction is proper in this case:

- Dr. Luther considered pneumonia to be a life-threatening medical condition.

- He noted in the emergency department record, "rule/out pneumonia," yet did not take any steps to determine the existence of pneumonia.

- His medical screening examination was not adequate for purposes of diagnosing an emergent medical condition.  At a minimum, Howarth required a chest x-ray for the purpose of ruling out infections or other processes in the lower respiratory tract (which encompasses the trachea, lungs, bronchi, bronchioles, and alveoli).

- Dr. Luther testified at his deposition that he believed Howarth had pneumonia, but he provided discharge instructions for bronchitis with bronchospasm (wheezing), thereby failing to alert jail staff to the more serious and life-threatening condition of pneumonia.

- Dr. Luther discharged Howarth without ensuring his condition was stable.  A recheck of sat levels following a nebulizing treatment did not sufficiently evidence stability.

- Dr. Luther admitted that patients presenting in the emergency room with an oxygen saturation level between 88 and 90 would ordinarily be admitted, but he did not have Howarth remain at the hospital.

This evidence supports Plaintiffs' theory that Dr. Luther made a conscious choice not to order appropriate diagnostic tests (such as a chest x-ray) to assess the existence and extent of Howarth's pneumonia.  As he acknowledged in his deposition, Dr. Luther's clinical impression was pneumonia, yet he inexplicably failed to assess it and gave discharge instructions for bronchitis.  Dr. Luther unquestionably knew that emergent pulmonary conditions present a risk of morbidity to patients.  Failing to order the appropriate diagnostic study presented a high probability that the extent of the disease process would not be discovered.  Moreover, it was objectively foreseeable that a delay in diagnosis and treatment created a high probability that serious or permanent harm would actually result.  For these reasons, the jury in this cause should be instructed on recklessness.

### III.    This case fits within the substantial factor causation framework.

The Idaho Supreme Court has considered this issue in the context of medical malpractice actions on more than one occasion.  In *Fussell v. St. Clair*, 120 Idaho 591, 593, 818 P.2d 295, 297 (1991), for instance, the defendant physician argued his conduct was not the "but for" cause of injury as the harm resulted from a hidden prolapsed umbilical cord.  In the appeal that resulted, the Idaho Supreme Court concluded the jury should have been instructed that the doctor's negligence could be a proximate cause of the injury so long as it was a "substantial factor" in bringing about the damage.  Thus, in any case where there is evidence of two or more causes both of which contributed to the damage, the "but for" instruction is inapplicable and inappropriate.  Instead, proximate cause should be defined using the substantial factor verbiage. *Id.* at 593—94, 818 P.2d at 297—98.

Similarly, in *Newberry v. Martens*, 142 Idaho 284, 287—88, 127 P.3d 187, 190—91 (2005),  the plaintiff contended he lost his eye as a result of the defendant physician failing to

locate a metal shard in his eye and failing to refer him to a specialist.  The defendant physician, on the other hand, argued that the vision loss was due to a virulent bacteria and that plaintiff would have lost his eyesight regardless of any negligence on his part.  The trial court gave the substantial factor causation instruction, and after judgment was entered in the plaintiff's favor, the defendant physician appealed.  The Idaho Supreme Court affirmed, reasoning that the substantial factor instruction must be given in any case where there are multiple possible causes of the plaintiff's injury.  Furthermore, this instruction strikes the appropriate balance between the parties, particularly given Idaho's rejection of the lost chance doctrine.  *Id.* at 291, 127 P.3d at 194.

In the present case, there are multiple potential causes of Howarth's death (the disease process itself, Dr. Luther's failure to provide proper intervention on the morning of January 23, 2014, and the jail's failure to return Howarth to the hospital later that day or the early morning hours of January 24).  Defendant Dr. Luther intends to argue other fault factors at trial.  Plaintiff need only establish that his conduct played a substantial factor in Howarth's death for liability to be imposed.

RESPECTFULLY SUBMITTED this 13th day of April, 2018.

OWENS, McCREA & LINSCOTT, PLLC

/s/ Regina M. McCrea
REGINA M. MCCREA, ISB #6845
Attorneys for Plaintiffs
Owens, McCrea & Linscott, PLLC
8596 N. Wayne Drive, Suite A
Hayden, Idaho 83835
Telephone: (208) 762-0203
Facsimile: (208) 762-0303
E-mail: rmccrea@omllaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was, on the 13th day of April, 2018, served electronically through CM/ECF to the following:

Michael E. Ramsden ....................................................................... mramsden@rmehlaw.com
Ramsden, Marfice, Ealy & Harris
700 Northwest Boulevard
PO Box 1336
Coeur d'Alene ID 83816-1336

William J. Schroeder................................................................ william.schroeder@ksblit.legal
Patrick E. Miller.......................................................................................pmiller@ksbit.legal
KSB Litigation, P.S.
221 North Wall Street, Ste 210
Spokane, WA 99201

   s/ Regina M. McCrea
Regina M. McCrea
Owens, McCrea & Linscott